**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

EDWARD RONALD ATES,

        Petitioner,

v.

STEPHEN D'ILIO, et al.,

        Respondents.

Civil Action No. 15-3531 (KM)

**OPINION**

APPEARANCES:

Joseph R. Donahue
Brickfield & Donahue
70 Grand Avenue, Suite 100
River Edge, NJ 07661
        On behalf of Petitioner,

Catherine A. Foddai
Senior Assistant Prosecutor
Bergen County Prosecutor's Office
Bergen County Justice Center
Hackensack, NJ 07601
        On behalf of Respondents.

**McNulty, United States District Judge**

## I. INTRODUCTION

The petitioner, Edward Ronald Ates, a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has filed a petition for a writ of habeas corpus. (ECF No. 1.) For the reasons explained in this Opinion, the Court will deny the Petition and will also deny a certificate of appealability.

## II. FACTUAL BACKGROUND & PROCEDURAL HISTORY

The factual background and procedural history in this matter were summarized in part by the New Jersey Superior Court, Appellate Division, on Petitioner's direct appeal.[1]

> Defendant's daughter, Stacey, and Paul Duncsak were married in 1999 and had two children. They divorced in 2003.
>
> Stacey did not fare well after the divorce. Child custody litigation resulted in Paul being named the parent of principal residence. At the time of Paul's murder, Stacey was unemployed and experiencing health and financial difficulties. On the other hand, Paul met Lori Adamo–Gervasi in 2005. Paul and Lori began dating in 2006 and became engaged with plans for a 2007 wedding in Cape May.
>
> Paul and Lori had decided that she and her son would move into Paul's house in Ramsey on August 24, 2006, while they attempted to sell Lori's house in Wyckoff. In the meantime, from August 8 to 23, Paul stayed at Lori's house. Paul would go to work from Lori's in the morning, stop at his house in Ramsey in the evening to check his e-mail and feed his parrot, and then return to Lori's for dinner and to spend the rest of the night. Because the Ramsey house was unoccupied, Paul did not leave the air conditioner on and always kept the doors locked.
>
> Defendant lived in Port Lucie, Florida, with his wife, Dottie, in an RV on property owned by Evelyn Walker, the couple's other daughter. Evelyn lived on the same property in a house equipped with a computer and an internet connection, which defendant often utilized.
>
> In early August 2006, defendant and Dottie began a trip north. On August 13, 2006, while in Wytheville, Virginia, they stopped at Walmart and purchased a TracFone cell phone and a card containing 120 minutes of service. The phone was activated on August 14, 2006. Records for the TracFone phone showed the first call was made on August 14, 2006, to the Pine Hill RV Campground in Kutztown, Pennsylvania. On the same day, "Ron Waverly" of Vero Beach, Florida, paid cash to stay at the campground from August 16 to 18, 2006.

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

2

On August 14, 2006, after checking in at the campground, defendant called an Enterprise Rent-a-Car in Allentown, Pennsylvania and later that day rented a Dodge Durango, selecting an option that allowed them to drive into New Jersey. Defendant returned the rented Dodge Durango to the Allentown Enterprise facility on August 15, 2006, and requested a car with better mileage; the Durango had been driven 500 miles in one day. As a replacement, defendant received a Hyundai Sonata, which was driven approximately 1,000 miles by the time it was returned on August 18, 2006.

Around 1:30 p.m. on August 23, 2006, Lori and a colleague, Helen Nikiforakis, went to Paul's house so Lori could show Helen where she would soon be living. Upon arriving, Helen noticed it was exceptionally warm inside and asked Lori to turn on the air conditioning; Lori said they would not be there long enough to justify it. Lori gave Helen a tour of the house that included a visit to the basement; Lori noticed that a furnace door, which was always left open for ventilation, was closed. This struck Lori as unusual. Lori then intended to show Helen a unique bathroom in the house but found the door was locked. This also seemed highly unusual to her. Lori and Helen left Paul's house around 2:30 p.m. While locking the door, Lori noticed a Burger King wrapper in the garbage outside that neither she, Paul, nor the children had placed there.

Around 6:20 p.m., Paul called Lori to tell her he was driving home to feed his parrot. Lori remained on the phone with Paul as he pulled into the driveway and exited his vehicle. Paul noticed the Burger King wrapper and mentioned to Lori that she must have left him a present; he also stated that Lori had left on the air conditioner. Suddenly, Paul shouted "no, oh no" then stopped speaking; Lori heard the bird scream and a loud thud. While still connected with Paul's cell phone, Lori tried calling the Ramsey house line from her house phone; no one answered. Lori's cell phone remained connected to Paul's as she dialed 9-1-1 from her house phone. While explaining to the 9-1-1 operator what had occurred, the line to Paul's cell phone went dead.

When police arrived at Paul's house, they found the doors were locked. A door was breached, and Paul's body was found in a pool of blood. Because there was no evidence of a forced entry, police were initially confused as to how someone could have entered until they found that a set of French doors leading from the master bedroom to the deck were unlocked.

3

At approximately 10:30 p.m. on August 23, 2006, Detective John Haviland went to Stacey's home. When he arrived, he observed a dark blue Ford Explorer in her driveway. Stacey explained that the Explorer was a loaner she was using while her vehicle was being repaired. Detective Haviland told Stacey that Paul was dead but did not advise her of the manner or cause of death. Detective Haviland returned later that evening to obtain contact information for defendant. Stacey provided defendant's cell phone number and her sister Evelyn's home phone number.

After a number of attempts, Detective Haviland reached Evelyn around 4:45 a.m. on August 24 and spoke to Dottie, who informed him that defendant was in Louisiana visiting his sick mother, Myra, and that there was no way to contact him because he left his cell phone in Florida. Police made several attempts to reach defendant by telephone.

On August 24, 2006, around 6:45 p.m., defendant left a voicemail for Detective Haviland providing his mother's telephone number as the means by which he could be contacted. Later that evening, defendant told Detective Haviland he left Florida the afternoon of August 20 and had driven to Louisiana, arriving on Tuesday, August 22, to visit his mother. Defendant said he could not document his trip because he paid in cash, slept in his car, and left his cell phone at home.

An autopsy determined that Paul sustained ten gunshot wounds resulting from a minimum of seven shots, none at close range. Examination of the locks at Paul's house revealed they had been aggressively picked shortly before the murder.

Search warrants were executed on defendant's RV and Evelyn's home in Florida. Police seized six computers, defendant's .22 caliber handgun, ammunition, and the door locks from French doors in Evelyn's house. Forensic tests on a hard drive from a computer retrieved from Evelyn's home revealed that in 2006, a company in the business of selling lock-picking sets received an order from someone using the computer and sent such a kit to "E. Ates." Several locks retrieved from Evelyn's house bore evidence that someone had used lock-picks on them. Additional tests on the computer revealed that Google searches were performed about "how to commit the perfect murder" and led to an article discussing mistakes made in a murder. The article recommended the use of an alias and a .22 caliber weapon. Several other searches yielded results

4

on lock-picking. Defendant also purchased two books through Amazon: "Workbench Silencers: the Art of Improvised Designs" and "More Workbench Silencers."

Defendant testified at trial. He asserted that by July 2006 he had no relationship with Paul and no reason to dislike him. Defendant explained that in August 2006, he learned Stacey's condominium unit was in danger of being foreclosed. He also testified that Stacey was "mentally distressed" because of her slow recovery from Bell's Palsy, and because of her concern that she might not "be able to live up to her part of the children's vacation that year" while "Paul was taking them on a better vacation."

According to defendant, in August 2006, he and Dottie intended to visit Stacey but by the time they had reached West Virginia, Stacey seemed very happy and was enjoying her time with the kids, so they lied to her and told her they were going to Louisiana to visit his mother, Myra. Instead, however, they found and stayed at a campground in Pennsylvania. Defendant explained that, feeling guilty about not visiting Stacey, he rented a car and decided to drive to Stacey's house to see how far away it was but then turned around and left without seeing her. They also drove past Paul's house at this time. According to defendant, he and Dottie returned the rental car because they wanted a smaller car. Defendant said that he and Dottie then traveled to Gettysburg, Valley Forge, the Delaware Water Gap, the Pocono Mountains, and around the Catskill Mountains. Upon returning to Florida, defendant left by himself to go to Louisiana to visit his mother. Defendant testified that he slept in his car instead of a hotel and arrived in Louisiana around 6:30 p.m. on August 23, 2006.

Defendant responded to forensic evidence obtained from his hard drive that revealed he had researched how to commit the perfect murder. Defendant said he heard of a book about this subject on Fox and Friends one morning and it piqued his interest. He acknowledged that he did an internet search regarding how to build a silencer and about lock-picking techniques because the book had discussed how easily obtainable that information was on the internet and, as a concerned parent, he wanted to see if that was true.

The defense also asserted that defendant could not have committed the murder because he was in Louisiana approximately twenty-fours hours after Paul was gunned down. The State offered testimony of a police officer who, shortly before trial, drove a Hyundai Sonata from Ramsey to Sibley, Louisiana, in twenty-one hours and thirty-four minutes, to demonstrate that it was not impossible for defendant to

5

have been in Ramsey at the time of the murder and in Sibley, Louisiana the next evening.

Defendant was arrested on June 12, 2007. He was indicted on September 28, 2007, and charged with: first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count two); second-degree burglary, N.J.S.A. 2C:18-2 (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); third-degree possession of a firearm without a permit, N.J.S.A. 2C:39-5(b) (count five); third-degree conspiracy to hinder apprehension, N.J.S.A. 2C:5-2 (count six); fourth-degree obstructing the administration of law, N.J.S.A. 2C:29-1 (count eight); and third-degree witness tampering, N.J.S.A. 2C:28-5 (count nine).

Prior to trial, there was considerable litigation regarding the wiretaps. Judge Harry G. Carroll denied defendant's motion to exclude or suppress wiretapped telephone communications between or among individuals not located in New Jersey. Defendant also unsuccessfully argued that the Wiretap Act was unconstitutional because it permitted New Jersey authorities to act outside their jurisdiction by listening in on communications between individuals with no connection to New Jersey.

Upon learning that conversations between defendant and his attorney had been recorded by the prosecutor's office as part of their wiretap operation, defendant moved to dismiss the indictment because twenty-three conversations between defendant and his attorney were recorded. The court found with respect to all but call # 278 that the police used proper minimization procedures, which shut down the recordation of audio portions of the conversation resulting in only "dead air" being audible on the recording. Call # 278, which occurred on October 23, 2006, however, was recorded in its entirety.

The judge conducted an evidentiary hearing to develop the issues raised and eventually denied the motion to dismiss the indictment. Judge Carroll found that call # 278 fell within the attorney-client privilege and was inadvertently but unlawfully intercepted. The judge also found that this was an isolated event, that no one at the prosecutor's office listened to call # 278, and that only a portion of the conversation regarded a possible defense. Although troubled by the violation and the State's failure to bring the violation to the attention of the court or defense counsel, Judge Carroll nevertheless determined that dismissal was not the proper remedy. Instead, the

6

> judge found that these circumstances tainted the wiretap operation from that point forward and, as a result, suppressed call # 278 and all calls thereafter intercepted.

*State v. Ates*, 46 A.3d 550, 552-56 (N.J. Super. Ct. App. Div. May, 17, 2012).

Following a jury trial, Petitioner was convicted on all counts. After merging various counts into the first-degree murder conviction, the trial court sentenced Petitioner to a life sentence subject to a sixty-three year and nine-month period of parole ineligibility. *Id.* at 556.

The Appellate Division affirmed Petitioner's conviction in a published opinion. *Id.* at 560. The New Jersey Supreme Court subsequently granted a petition for certification and heard Petitioner's arguments about the unconstitutionality of New Jersey's wiretapping statute, before it affirmed the conviction. *State v. Ates*, 86 A.3d 710 (N.J. 2014).

Petitioner filed this Petition for federal habeas relief on May 21, 2015. (ECF No. 1.) Respondents filed an Answer on June 29, 2015. (ECF No. 4.) Petitioner filed a reply on August 26, 2015. (ECF No. 8.) The matter is fully briefed and ready for disposition.

## III. STANDARD OF REVIEW

Through counsel, Petitioner filed a habeas petition, citing 28 U.S.C. § 2241 ("Section 2241"). (ECF No. 1.) Because Petitioner is a state offender challenging the validity of his state conviction, the court construes the petition as one for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Section 2254"). *See Washington v. Sobina*, 509 F.3d 613, 618 n.5 (3d Cir. 2007) (citation omitted); *see Also Coady v. Vaughn*, 251 F.3d 480, 484-85 (3d Cir. 2001). ("In the instant action, both Sections 2241 and 2254 authorize [petitioner's] challenge to the legality of his continued state custody. However, with respect to habeas petitions filed by state prisoners pursuant to Section 2254, Congress has restricted the availability of second and successive petitions through Section 2244(b). Allowing [petitioner] to file the instant petition in federal court pursuant to Section 2241

7

without reliance on Section 2254 would circumvent this particular restriction in the event that [petitioner] seeks to repetition for habeas relief and would thereby thwart Congressional intent.")

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Under Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts. *See Renico v. Lett*, 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court has adjudicated a petitioner's federal claim on the merits, a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)).

8

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions," as of the time of the relevant state-court decision. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000))). A decision may be "contrary to" a Supreme Court holding within the meaning of 28 U.S.C. § 2254(d)(1), if the state court has identified the correct governing legal principle from the Supreme Court's decisions but has unreasonably applied that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of AEDPA necessarily apply. First, AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). Second, AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the court of the State." 28 U.S.C. 2254(b)(1)(A). To do so, a petitioner must "fairly present all federal claims to the highest state court before bringing them in a federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d. Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations

9

of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d. Cir. 2004). This procedural bar applies, however, only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365-66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007); *see also Gray v. Netherland*, 518 U.S. 152 (1996), and *Coleman v. Thompson*, 501 U.S. 722 (1991)). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

Even if a petitioner's constitutional claims are unexhausted or procedurally defaulted, a court may opt to deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

## IV. ANALYSIS

The Petition raises two grounds for relief, both of which arise from the trial court's denial of Petitioner's pre-trial motion to dismiss the indictment. Petitioner argues that the trial court's ruling contravened his Fourth Amendment right to be free from unreasonable search and seizure as well

as his Sixth Amendment right to counsel. For the reasons explained *infra*, this Court finds that Petitioner's claims do not warrant granting federal habeas relief.

A.  Pre-Trial Motion to Suppress and Dismiss Indictment

Petitioner asserts that the trial court's denial of his motion to dismiss the indictment on the basis of unconstitutional wiretap surveillance was erroneous. (ECF No. 1 at 7-10.) Petitioner argues that the New Jersey Wiretapping and Electronic Surveillance Control Act ("Wiretap Act"), N. J. Stat. Ann. § 2A:156A-1-37, reaches so broadly as to violate the Fourth Amendment's prohibition on unreasonable search and seizures. In particular, Petitioner objects to the Act's extending to interceptions of communications between parties outside of New Jersey.

The New Jersey Supreme Court heard Petitioner's arguments on this issue, but affirmed the lower court's ruling:

> "[T]he Legislature's focus on the 'point of interception' is a rational approach in the age of cell phones. Because of the inherent mobility of cell phones, it would be impractical, if not impossible in some instances, for law enforcement to intercept cell phone conversations if agents could only rely on orders issued in the state where a call was placed or received. Under that type of scheme, a court order would lose its force as soon as a target crossed state lines with a cell phone in hand."

*Ates*, 86 A.3d at 712-13. In support of that ruling, the Appellate Division cited persuasive authority from other jurisdictions, including federal courts which adjudicated analogous claims under Title III of the Omnibus Crime and Safe Streets Act "Title III", 18 U.S.C. §§ 2510-2520, on which our State's Wiretap Act was modeled. *Id.* at 719-20.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Any evidence seized in violation of the Fourth Amendment is excluded from introduction at trial. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 348 (2006). It is not controversial that the Fourth

11

Amendment imposes limits on wiretap surveillance; for that proposition, the court need look no further than the seminal cases of *Katz v. United States*, 389 U.S. 347 (1967) (wiretap of public phone booth) and *Berger v. New York*, 388 U.S. 41 (1967).

Nevertheless, the extent to which Fourth Amendment challenges may be raised in a federal habeas proceeding is extremely limited; most such issues are left to the state court. The Supreme Court held long ago in *Stone v. Powell*, 428 U.S. 465, 494-95 (1976), that "where the State has provided a full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494-95 (1976).

The *Stone v. Powell* bar applies here. In this case, each level of the state court system, including the New Jersey Supreme Court, addressed Petitioner's Fourth Amendment claim at the trial level and on direct appeal. There is no indication that Petitioner was not given a full and fair opportunity to litigate this claim. Therefore, this Court is barred from hearing that Fourth Amendment claim in this § 2254 habeas proceeding.

To remove doubt, however, I briefly consider the merits, and find that Petitioenr's Fourth Amendment claim, if considered, would necessarily be denied.

Shortly after the murder, New Jersey law enforcement officials applied for and received authorization for the interception of communications over several telephone facilities. These included multiple prepaid cellular phone lines known to be used by Petitioner and his wife, his two daughters' respective cellular and landlines, and his sister's telephone number. *Ates*, 86 A.3d at 714-15. The wiretaps, which were authorized by Judge Marilyn C. Clark, a designated wiretap judge, were all monitored in New Jersey. *Id.* The petitioner's daughter, Stacey, was a resident of New Jersey when the wiretap of her telephone was authorized. All of the other telephone numbers

subject to the wiretap order, however, were assigned to individuals who were residents of either Florida or Louisiana. *Id.* at 715.

Petitioner maintains that the New Jersey Supreme Court "wrongfully upheld" the Wiretap Act's application here, which was "unconstitutionally broad" in that it applied to out-of-state telephones. (ECF No. 1 at 9.) Implicit in Petitioner's argument is that law enforcement agencies would have to obtain an order or warrant from each jurisdiction to which the user of the target telephone may travel during the surveillance period. As the New Jersey Supreme Court noted in Petitioner's direct appeal, this could have a chilling effect on an investigation in today's mobile society. *Ates*, 86 A.3d at 712.

Petitioner himself, to take an example, was a Florida resident who in the course of the underlying events traveled by car to New Jersey while making stops along the way and back. The Act, as he interprets it, would be an ineffectual tool in investigating him or someone like him. Even fifty years ago, the *Katz* Court foresaw the emerging technology and "shift[ed] the focus of the Fourth Amendment from places to people." Timothy Casey, *Electronic Surveillance and the Right to Be Secure*, 41 U.C. Davis L. Rev. 977, 1026 (2008).

Petitioner here points to no clearly established federal authority supporting his position. Indeed, the most analogous federal precedent is to the contrary. Based in part on the practical considerations identified above, the federal courts have overwhelming accepted the "listening post" theory—*i.e.*, that it is sufficient that the point of interception of the communications lies within the court's territorial jurisdiction. The Third Circuit, in *United States v. Jackson*, 849 F.3d 540, 551 (3d Cir. 2017), adopted that theory in relation to federal wiretaps:

> We join the other courts of appeals that have addressed this issue in adopting the "listening post" theory that under Title III either the interception of or the communications themselves must have been within the judge's territorial jurisdiction *See United States v. Cano–*

13

*Flores*, 796 F.3d 83, 87 (D.C. Cir. 2015), cert. denied, —— U.S. ——, 136 S.Ct. 1688, 194 L.Ed.2d 790 (2016) (adopting the "listening post" theory and reasoning that requiring a new "wiretap order in every district where [the government] thought a target could make calls ... seems unworkable"); *United States v. Henley*, 766 F.3d 893, 911–12 (8th Cir. 2014), cert. denied, —— U.S. ——, 135 S.Ct. 2065, 191 L.Ed.2d 968 (2015); *United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006) ("The most reasonable interpretation of the statutory definition of interception is that an interception occurs where the tapped phone is located and where law enforcement officers first overhear the call."); *United States v. Jackson*, 207 F.3d 910, 914 (7th Cir. 2000), vacated on other grounds, 531 U.S. 953, 121 S.Ct. 376, 148 L.Ed.2d 290 (2000); *United States v. Denman*, 100 F.3d 399, 403 (5th Cir. 1996); *United States v. Tavarez*, 40 F.3d 1136, 1138 (10th Cir. 1994) (holding that the Oklahoma wiretap statute, like the federal statute, authorizes wiretaps within the territorial jurisdiction where the contents were first heard); United *States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992) (holding that "[i]t seems clear that when the contents of a ... communication are captured or redirected in any way, an interception occurs at that time" but also "since the definition of interception includes the 'aural' acquisition of the contents of the communication, the interception must also be considered to occur where the redirected contents are first heard").

It would not be grounds for federal habeas relief that the authorities violated local law. But for what it is worth, New Jersey's Wiretap statute, like the federal statute, provides that a wiretap "may be executed at any point of interception[2] within the jurisdiction of an investigative or law enforcement officer executing the order." N.J. Stat. Ann. § 2A:156A-12h.

The state court's well-reasoned opinion was consistent with, and certainly not contrary to, clearly established federal law. Therefore, even if not barred by *Stone*, this claim would fail on the merits.

---

[2] New Jersey's Wiretap Act defines an "intercept" as "the aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical, or other device." N.J. Stat. Ann. § 2A:156A-2c.

B. Sixth Amendment Right to Counsel

Petitioner next argues that the challenged wiretap recordings violated his Sixth Amendment right to counsel and that the trial court's partial suppression of these calls was an insufficient remedy. (ECF No. 1 at 10-16.) The New Jersey Supreme Court rejected Petitioner's claim, adopting the reasoning of the Appellate Division. *Ates*, 86 A.3d at 722. In reaching its decision, the Appellate Division in turn deferred to the factual findings of the trial court. *Ates*, 46 A.3d 550, 558 (N.J. Super. Ct. App. Div., May 17, 2012).

The trial court, finding that a privileged communication was intercepted, suppressed the results of the wiretap from that point forward, but declined to dismiss the indictment:

> In determining this unauthorized interception to be inadvertent, the court also looks to the significant number of phone calls which indisputably transpired between defendant and the Lesnevich law office. This court finds that those other communications were promptly minimized and not recorded. Hence, rather than establishing a pattern of unauthorized and unlawful interception of privileged communications, the court finds the interception and recording of call # 278 to have been an isolated and aberrant event.
>
> As in *Santiago*, and unlike *Sugar*, this court finds no evidence that any member of the Bergen County Prosecutor's Office actually listened to call # 278, and hence is unable to conclude that the State obtained any confidential information pertaining to trial preparation and defense strategy. In arriving at this determination the court has again assessed the credibility of the State's witnesses who testified at the hearing and finds their testimony credible.
>
> At the request of the defense the court listened to call # 278 in camera. Two topics were discussed between Lesnevich and defendant during that call which was slightly longer than five minutes in duration. One of these topics the court finds to be substantively innocuous. As to the other, the court finds it to be more akin to what the [New Jersey] Supreme Court in *Sugar* categorized not as a revelation of trial strategy or a strategic decision, but more accurately reflects an awareness of a possible defense.

15

*State v. Ates*, 46 A.3d 605, 613-14 (N.J. Super. Ct. July 21, 2009).

The stringent standard by which courts must evaluate claims of violations of the right to counsel is well established:

> The fundamental justification for the sixth amendment right to counsel is the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense. Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful. The purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact finding process itself. Even guilty individuals are entitled to be advised of strategies for their defense. In order for the adversary system to function properly, any advice received as a result of a defendant's disclosure to counsel must be insulated from the government. No severe definition of prejudice, such as the fruit-of-the-poisonous-tree evidentiary test in the fourth amendment area, could accommodate the broader sixth amendment policies. We think that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case. Any other rule would disturb the balance implicit in the adversary system and thus would jeopardize the very process by which guilt and innocence are determined in our society.

*United States v. Levy*, 577 F.2d 200, 209 (3d Cir. 1978). Based on these standards, Petitioner argues that nothing short of dismissal of the indictment would have adequately vindicated his right to counsel.

Cases brought under the New Jersey Wiretap Act are frequently analyzed under the lens of the federal wiretap statute, which it mirrors. *See Bradley v. Atl. City Bd. Of Educ.*, 736 F. Supp. 2d 891, 899 n.15 (D.N.J. 2010). Like the Wiretap Act, Title III imposes a duty to minimize the intercepted communications that are not relevant to the criminal investigation. See 18 U.S.C. § 2518(5). Title III provides:

> Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable,

> shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception....

Federal case law has not interpreted Title III, however, to require suppression of a wiretap whenever a violation has occurred:

> The Supreme Court has made clear that suppression is not automatically required for every Title III violation; rather, as a sister circuit summed up the Supreme Court's precedents in *United States v. Johnson*, violations of even ... central requirements do not mandate suppression if the government demonstrates to the court's satisfaction that the statutory purpose has been achieved despite the violation.

*United States v. Cunningham*, 113 F.3d 289, 293-94 (1st Cir. 1997) (citations and internal quotation marks omitted).

An impermissible intrusion into the attorney-client relationship requires a realistic probability of prejudice to the defendant or of benefit to the prosecution. *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977). The Supreme Court reiterated this standard in *United States v. Morrison*, 449 U.S. 361 (1981), which involved an intrusion more egregious than the one in this case. In *Morrison*, federal agents repeatedly met with a defendant in a pending case outside the presence of her counsel. Their goal was to obtain her cooperation in an unrelated investigation by suggesting a potential benefit to the disposition of her then-pending case. *Id.* at 362-63. The Supreme Court held that there was no prejudice of any kind, either transitory or permanent, to the ability of [defendant's] counsel to provide adequate representation in these criminal proceedings." *Id.* at 366.

Here, Petitioner has not established how he was prejudiced, or the prosecution aided, by the challenged interceptions. As the Appellate Division pointed out, the trial court determined factually that "no one at the prosecutor's office listened to call # 278, and that only a portion of the conversation regarded a possible defense." *State v. Ates*, 46 A.3d at 556; *see United States v. Mitan*, 499 F. App'x 187, 192-93 (3d Cir. 2012) ("[W]hile the government made mistakes, it undertook

17

measures to ensure that it did not invade the defense camp. If any communication concerning legal strategy was intercepted, it was unintentional . . . "). Notwithstanding this, the trial court went a step farther to protect Petitioner's rights. It suppressed the recording of Petitioner's conversation with his counsel, and suppressed all subsequent interceptions. This, if anything, went beyond what the statute requires in terms of suppression. Most fundamentally, Petitioner has not identified how these interceptions, suppressed as evidence, nevertheless affected the quality of his trial counsel's representation. *Morrison*, 449 U.S. at 365. ("[t]he constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation . . .").

No clear federal authority would have required that suppression go farther, or that the indictment be dismissed. This claim is denied.

## V. CERTIFICATE OF APPEALABILITY

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter. *See* Third Circuit Local Appellate Rule 22.1. The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Based on the discussion in this Opinion, Petitioner has not made a substantial showing of denial of a constitutional right. This Court will not issue a certificate of appealability.

## VI. CONCLUSION

For the reasons discussed above, Petitioner's habeas petition is denied and a certificate of appealability shall not issue. An appropriate order will be entered.

Dated: May 24, 2018

/s/ Kevin McNulty
KEVIN MCNULTY
United States District Judge